**LAW OFFICES**
# TARPLEY & MORONI, LLP
A Law Firm including a Professional Corporation
American Life Building
137 Murray Boulevard, Ste 201
Hagåtña, Guam 96910-5104
Telephone: (671) 472-1539
Fax: (671) 472-4526

**F I L E D**
DISTRICT COURT OF GUAM

DEC 0 5 2002

MARY L. M. MORAN
CLERK OF COURT

*Attorney for* Plaintiff

UNITED STATES DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| JERRY J. EDWARDS, ) | CIVIL ACTION NO. 02-00003 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **DECLARATION IN SUPPORT OF** |
| ) | **MOTION TO COMPEL PRODUCTION** |
| SECRETARY OF THE NAVY, ) | **OF DOCUMENTS** |
| GORDON R. ENGLAND, ) | |
| ) | |
| Defendant. ) | |

I Ron Moroni, pursuant to the laws of Guam and under penalty of perjury hereby declare as follows:

1.    I am the attorney for the Plaintiff herein.  I have personal knowledge of the facts contained in this affidavit.

2.    On September 25, 2002, I served on the defendant a request for production of documents, a copy of which is attached hereto as Exhibit A.  Pursuant to the Rules of Civil procedure, Defendant was required to respond to that request within thirty (30) days or by October 25, 2002.

3.    I have communicated on a number of occasions with Defendant's counsel about the request for production of documents.    Defendant's counsel has never indicated that

**ORIGINAL**

Defendant objects to any of the requests, and has always assured me that he does intend to produce the required documents.

4. Between October 21, 2002 and October 25, 2002, I traveled to Japan in order to interview witnesses related to this case and to review the production of documents. However, because of an illness in his family, Defendant's counsel was not able to attend the trip and the documents were not available for inspection while the undersigned was in Japan.

5. Since that time, Defendant's counsel has indicated that he is working to compile the requested documents, and that Defendant does intend to produce the documents see Exhibits B & C attached hereto.

6. The scheduling order approved by this court set October 30, 2002, as the deadline for the completion of discovery, and January 31, 2003, as the deadline for filing dispositive motions. I cannot properly prepare dispositive motions, until after I have received the requested documents and have had ample time to review those documents. This is an employment discrimination case. One of the tasks of Plaintiff will be to establish a pattern of practice that is racially discriminatory. This will require a lengthy and extensive analysis of the documents requested. I will need at least thirty (30) days to prepare dispositive motions, after receiving the requested documents.

7. Defendant's counsel has indicated that he is, in good faith, attempting to obtain the required documents. However, because of the time limits set in the court's scheduling order, Plaintiff must ask the court to compel the production of

documents and to set a date certain for the production, and to extend the deadline for filing dispositive motions.

Further declarant sayeth naught.

Dated this 4th day of December, 2002.

_____
Ron Moroni



RECEIVED
U.S. ATTORNEY'S OFFICE
DISTRICT OF GUAM
2002 SEP 25 PM 2: 59

LAW OFFICES
# TARPLEY & MORONI, LLP
A Law Firm including a Professional Corporation
American Life Building
137 Murray Boulevard, Ste 201
Hagåtña, Guam 96910-5104
Telephone: (671) 472-1539
Fax: (671) 472-4526

*Attorney for* Plaintiff

UNITED STATES DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | | |
|---|---|---|
| JERRY J. EDWARDS, | ) | CIVIL ACTION NO. 02-00003 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **PLAINTIFF'S REQUEST TO** |
| | ) | **SECRETARY OF THE NAVY,** |
| SECRETARY OF THE NAVY, | ) | **GORDON R. ENGLAND FOR** |
| GORDON R. ENGLAND, | ) | **PRODUCTION OF DOCUMENTS** |
| | ) | |
| Defendant. | ) | |

**TO: DEFENDANT AND ITS ATTORNEYS OF RECORD, U.S. ATTORNEY**

**YOU ARE HEREBY REQUESTED** pursuant to Rule 34 of the Superior Court of Guam Rules of Civil Procedure, for Plaintiff and his attorney of record to inspect and to copy the following documents which shall be made available to Plaintiffs counsel at the Law Offices of Tarpley & Moroni, LLP, American Life Building, 137 Murray Boulevard, Suite 201, Hagatna, Guam 96910-5104, within thirty (30) days of service of this request on you.

## INSTRUCTIONS AND DEFINITIONS

1. "You" and "Your" refer to Defendant Secretary of the Navy, Gordon R. England.

2.    "Person" includes a natural person, firm, association, organization, partnership, business trust, corporation, or public entity.

3.    "Writing" means any tangible thing upon which is recorded any form of communication or representation, including letters, words, pictures, sounds recording, or other method of recording. This definition includes, but is not limited to, records, reports, papers, documents, photographs, books, letters, notes, memoranda, statements, tape recording, photograph recording, and microfilm, whether in your possession or under your control or not, relating to or pertaining in any manner to the subject in connection with which it is used and includes, without limitation, all file copies and all drafts prepared in connection with such writings, whether used or not.

4.    As used herein, the term "documents" mean and include any and:

a.    Tangible things or times, whether handwritten, typed, printed, tape recorded, electronically recorded, video-tape recorded, visually reproduced, steno graphically reproduced or reproduced in any other manner;

b.    Originals and all copies of any and all communications;

c.    Writings of any kind or type whatsoever;

d. Data complications from which information can be obtained and translated, if necessary, by the respondent through detection devices into reasonable usable form;

e. Books and pamphlets;

f. Micro tape, microfilm, photographs, movies, records, recordings, tape recordings and video-tape recordings, steno graphically or otherwise reproduced;

g. Diaries and appointment books;

h. Cables, wires, memoranda, reports, notes, minutes and interoffice communications;

i. Letters and correspondence;

j. Contracts or agreements

k. Other legal instruments or official documents;

l. Deeds, leases, mortgages, assignments other instrument relating to the real property or personal property;

m. Published material of any kind;

n. Financial statements, balance sheets, profit and loss statements, statement of financial condition, income tax returns, worksheets, reports, projections, schedules, ledgers, books, records, and journals;

o. Vouchers, expense accounts, receipts, invoices, bills, orders, billings and checks;

p. Investigation or incident reports;

q.  Files and records;

r.  Notes or summaries of conferences, meetings, discussions, interviews, or telephone conversations or message;

s.  Travel reports and vouchers;

t.  Drafts or draft copies of any of the above.

5.  The term "complaint" as used herein shall mean the complaint filed against you in the within entitled action.

6.  Each of these definitions and instructions are hereby incorporated into each of the Requests to which it pertains.

7.  The following instructions are to be considered applicable to all demands for production of documents contained herein;

a.  In producing these documents, you are requested to furnish all documents known or available to you regardless of whether these documents are possessed directly by you or your attorneys or their agents, employees, representatives or investigators.

b.  If any of these documents cannot be produced in full, produce to the extent possible specifying your reasons for your inability to produce the remainder and stating whatever information, knowledge or belief you do have concerning the produced portion.

c.  If any documents requested were at one time in existence, but are no longer in existence, please so state, specifically for each document or thing,

      (1)  The type of document or thing,

      (2)  The types of information contained thereon,

          (a)  The date upon which it ceased to exist,

          (b)  The circumstances under which it ceased to exist,

          (c)  The identity of all persons having knowledge of the circumstances under which it ceased to exist, and

          (d)  The identity of all persons having knowledge or who had knowledge of the contents thereof.

d.  this request is a continuing one.  If, after producing documents, you obtain or become aware of any further documents responsive to this request, you are required to produce to Plaintiff such additional documents.

(Note:  **If you claim a privilege against producing any documents, submit a list describing such documents, including their author or originator, the persons to whom they were directed, their date and who has seen them, and the reasons why you will not produce them.)**

5. On page 79 on the administrative transcript (excerpts attached) the witness identifies "Fleet activities CAF instructions" and "CANJF's instructions". Please produce copies of these instructions.

6. On page 93, lines 9 through 12, of the administrative transcript (excerpts attached) the witness identifies reports that he would receive from either "Security, or NCIS, or from the Japanese Police." Please provide copies of all such reports received by Robert J. O'Neill, at anytime during his service at the Yokosuka Naval Base.

7. Please provide all documents containing any information regarding or reference to any recommendations made by Robert J. O'Neill, with respect to the above described report.

8. On page 93, lines 13 through 15, of the administrative transcript (excerpts attached) the witness states that reports with his recommendation would be presented to "Chief Staff Officer, and also the Captain," who would "review it.... (and) forward up to the captain with their own thoughts." Please provide all documents that are referred to in the above quotations.

9. On page 93, lines 23 and 24 of the administrative transcript (excerpts attached) the witness testified that "CAF is initiated through a report from either Security or NCIS or Japanese Police, and then we made a conscious decision to send it that

route." Please provide copies of all such reports made or modified at any time from January 01, 1995 through the end of the year 2000.

10. On page 93, line 25 of the administrative transcript (excerpts attached) the witness testifies that "we made a conscious decision to send it that route," referring to the reports described above. Please provide all documents containing any information regarding or reference to any recommendations to forward or not forward any matter into the CAF procedures.

11. On page 94, lines 1 through 2 of the administrative transcript, (excerpts attached) the witness testifies that "the CAF officer who heard all the facts would make the recommendation." Please provide copies of all recommendations made by any CAF officer at the Yokosuka Naval Base at anytime from January 01, 1995 to the end of the year 2000.

12. On page 95, lines 16 through 22 of the administrative transcript (excerpts attached) there is discussion regarding the criteria used to "differentiate between the period of length of debarment." Please provide all documents containing any information regarding or reference to such criteria.

13. In the administrative transcript, beginning on page 102 line 18 through page 103 line 1 (excerpts attached} the witness refers to morning meetings where they would go over "every incident that occurred on the security blotter …" Please provide copies of

all security blotters that may have been reviewed by either Master Chief Moore or Captain James O'Neill at any time during their service at Yokosuka Naval Base.

14. On page 103, line 8 of the administrative transcript (excerpts attached) the witness refers to an incident or complaint report. Please provide copies of all such reports that would have been reviewed by either Master Chief Moore or Captain James O'Neill, at any time during their service at Yokosuka Naval Base.

15. On page 103, lines 11 through 12 of the administrative transcript (excerpts attached) the witness refers to "a recommendation to the chief staff officer and the captain that somebody be debarred." Please provide copies of all such recommendations made at any time by Captain James O'Neill during his service in the United States Military.

16. On page 130, line 4 through 16 of the administrative transcript (excerpts attached) the witness, Steven Moore, refers to requests for background checks. Please provide copies of all requested background checks that would have been received by Steven Moore at anytime during his service at Yokosuka Naval Base.

17. With respect to the above described background checks please produce all documents that would contain any information regarding any background checks actually performed in whole or in

part by Steven Moore, at any time during his service at the Yokosuka Naval Base.

18. On page 144 lines 19 through 21, of the administrative transcripts (excerpts attached) the witness refers to "a desk journal" that he would receive every morning as part of his duties. Please provide copies of all such desk journals that may have been reviewed by Master Chief Moore, at any time during his service at Yokosuka Naval Base.

19. On page 162 lines 20 through 21 of the administrative transcripts (excerpts attached) the witness, Master Chief Moore, states that he had "just left the command where I made numerous recommendations for disciplinary action one way or the other for over four years..." Please provide copies of all recommendations for disciplinary action made by Master Chief Moore, during his previous command, as referenced in the above quote. Please include in your response documents that would identify the individuals or incidents involved or giving rise to the recommendation; the race and present contact information of any such individuals; the facts leading up to the recommendation; and the final disposition or action taken as a result of Master Chief Moore's recommendation.

20. On page 168 lines 6 through 19 of the administrative transcripts, (excerpts attached) the administrative judge and the witness discussed action taken by Master Chief Moore with respect

to an individual named Richard Mason. Please provide all documents containing any information regarding or reference to any involvement that Master Chief Moore may have had with this individual. Please include in your response all documents explaining the nature of the incident which gave rise to concern on Master Chief Moore's part; any and all recommendations made by any military personnel discussing whether discipline should or should not imposed on Mr. Mason; documents showing the final disposition taken with respect to Mr. Mason's case.

21. On page 168 on the administrative transcript, (excerpts attached) the administrative judge asserts that Master Chief Moore "developed a package to support (his) recommendation" with respect to Richard Mason. Please provide the entire package so developed by Master Chief Moore.

22. Please provide copies of any and all Naval procedures and policies with regard to the debarment of any person from a Naval base, including but not limited to the Naval base at Yokosuka, Japan.

23. Please provide a list of all persons debarred from the Naval base at Yokosuka, Japan within the past five (5) years, including but not limited to any and all memoranda with regard to each debarment, the individual's name, address and phone number, position/title, series/grade level, and race/color.

24. Please provide the employment history with the Navy and the current location of Master Chief S.B. Moore, including but not limited to address and phone number, email address, employment dates, positions/titles, series/grade level, any and all reviews and evaluations by superiors or peers.

25. Please provide a list of all persons recommended for debarment by Master Chief S.B. Moore, including but not limited to current name, address and phone number, position/title, series/grade level, and race/color.

26. Please provide a copy of any and all Naval policies and procedures with regard to the authority of the military police, including but not limited to authority over civilians employed on or by the military installation, procedures for arrest and detention, including rights of the accused, jurisdictional boundaries for military police, any protocol for off-base security and general duties of military police and security.

27. Please provide a hierarchical listing of the officer personnel stationed at the Naval base at Yokosuka beginning with the Commander of the base and his/her subordinates and going downward in command, including but not limited to name, address and phone number, position/title, series/grade level, and race/color.

28. Please provide a copy of the "SOFA", or Status of Forces Agreement with regard to the Naval base at Yokosuka.

29.  Please provide the employment history with the Navy and current location of, including but not limited to address and phone number, employment dates, positions/titles, series/grade level, any and all reviews and evaluations by superiors or peers, of the following: Daniel Lloyd Collins, Olufeni A. Adepoju, Douglas J. Carvey, Arnold Fisher, Manolo Pedro, Darnell Charles Mebane and J. M. Wylie, Commander Fleet Activities.

30.  Please provide a copy of the "Keiji Tokubetsulto", Law for Special Measures concerning criminal cases to implement the agreement under Article VI of the Treaty of Mutual Cooperation and Security between Japan and the U.S. Armed Forces in Japan.

31.  Please provide a copy of any written memoranda or recording with regard to the fact finding, interviews, written responses, witness statements or other pertinent documents of the inquiries made by Shanta. Barbara, Wanda Watson-Young and Lydia Grandbois.

32.  Please provide a copy of the Naval policies and procedures for civilians employed on or by the Naval base at Yokosuka, including but not limited to policies and procedures for employment, their access to base facilities, behavioral responsibilities of civilians, accommodations of civilians, benefits of employment on or by the military installation, rights of employment by the military installation and reasons for

termination of employment by the military installation and debarment from the base.

33. Please provide a listing of the military attorneys stationed at the Naval base at Yokosuka for the past five (5) years, including but not limited to address, phone number, position/title, series/grade level, and email address.

34. Please provide a copy of the Naval policies and procedures with regard to any occasion in which any military personnel or civilians employed on or by the military installation, may claim to be discriminated against.

35. Please provide any and all documentation of the alleged trespass by Jerry Edwards onto Camp Zama on June 23, 1999.

36. Produce all documents submitted to the United Stated Equal Employment Opportunity Commission or received from the United States Equal Employment Commission regarding Jerry J. Edwards.

37. Produce the complete and entire personnel file including but not limited to all discipline, evaluation, benefits and rates of pay for the following: Chief Ms. Moore and Jerry J. Edwards.

38. Produce Defendant's complete and entire personnel policy and procedures manual and/or employee handbooks including, but not limited to policies and procedures regarding discipline, evaluations, benefits, suspensions, terminations and workplace violence in effect on January 11, 1999.

39.  Produce  all  documents,  statements,  affidavits,  tape recording, e-mails, written statements, investigative reports which support or relate to you debarment of Jerry J. Edwards.

40.  Produce  all  documents,  statement,  affidavits,  tape recordings,  e-mails,  which  support  correlate  to  your  response  to the interrogatories submitted by Plaintiff to the Defendant.

Dated this 25th day of September, 2002.

Law Offices
Tarpley & Moroni, LLP


By: _____
Ron Moroni
Attorneys for Plaintiff

1    enjoying Status of Forces Agreement status in Japan. You're

2    familiar with that procedure, are you?

3        A    Yes, I am.

4        Q    And briefly tell the Court in summary what that

5    procedure provides.

6        A    Would you go back and state the previous question

7    that I just answered? I'm not sure what you're driving at

8    here.

9        Q    I just asked, and you told us, that you're

10   familiar with the procedure labelled "misconduct by family

11   members of U.S. naval service and civilian personnel enjoying

12   Status of Forces Agreement status in Japan."

13       A    I'm not sure what you're talking about, and I

14   guess I need a little bit more definition.

15       Q    All right. Reading on down:

16           "The purpose is to establish proce-

17           dures to assist local area coordina-

18           tors and advise Commander, U.S. Naval

19           Forces, Japan so appropriate action

20           may be taken in response to alleged

21           misconduct of inappropriate personal

22           behavior on the part of persons,

23           including, but not limited to, family

24           members and other SOFA status civil-

25           ians under COMN -- [what is this?] --

1  COMNAV for Japan cognizance who are

2  not subject to the Uniform Code of

3  Military Justice."

4  Is that, in a word, the CAF procedure?

5  A     There is a CAF procedure -- Civilian

6  Administrative Forum.

7  Q     Okay. And you were familiar with the CAF

8  procedure?

9  A     Oh, yes.

10  Q     And is it true, as you handled debarment cases

11  while you were commander, that sometimes there was a CAF

12  procedure, and sometimes there was not?

13  A     That's true, I believe.

14  Q     And were you the one who determined whether there

15  was a CAF procedure or not?

16  A     I was not necessarily the one who determined

17  whether any particular individual was going to be referred to

18  a CAF or not.

19  Q     How did that get determined?

20  A     Well, usually, I think, CAF appointments and so

21  forth were generated by my staff judge advocate's office, and

22  basically, I was the ultimate CAF authority, if you will, in

23  terms of imposing any administrative measures on any

24  particular individual.

25  Q     So while under your command, there wasn't a

1   standardized CAF procedure for meeting when CAF would be

2   provided and when CAF would not be provided?

3       A    I don't know that -- I would not go so far as to

4   say there was not a standardized procedure.

5       Q    Okay.  Then what was the procedure?

6       A    Normally, when a family member -- usually a

7   younger person -- sometimes older -- got involved in some

8   sort of fracas, they'd be referred to a CAF -- Civilian

9   Administrative Forum.

10      Q    So what was the policy in regard to civilian

11  employees?

12      A    Well, I'm trying to remember.  I mean, there's

13  probably any number of outcomes that would be possible for a

14  civilian employee.  CAF possibly would be one of them.

15      Q    So there was no policy for when CAF should be

16  applied to civilian employees?

17      A    I think I'm just getting too far into the

18  recollection business here, and I'd like to refer you to

19  the -- probably the Fleet Activities CAF instruction or

20  perhaps CNFJ's instruction on that, which we follow to the

21  letter.

22      Q    Well, the letter of the CAF procedure allows for

23  a response to "alleged misconduct," and then defines

24  "misconduct" as a violation of local law.  Do you recall

25  that?

1  being sought in connection with this discrimination complaint

2  filed by Mr. Edwards as a result of his debarment from

3  Yokosuka Naval Base by Captain Wylie on 20 January 1999. So

4  if you please could respond to these following questions.

5  What was your role -- these are general questions relative to

6  the debarment process. What was your role relative to

7  debarments from the Yokosuka Naval Base? Can you please

8  describe that process.

9      A    Well, what would normally happen is I would

10 receive some sort of report. It would come from either

11 Security, or NCIS, or from the Japanese police. I would

12 review the report, the facts, and with the report I would

13 place my recommendation, present it to, at the time, the

14 chief staff officer, and also the captain. She would review

15 it. She would forward it up to the captain with her own

16 thoughts. And then the captain would make a decision.

17     Q    Okay. Now, they have a process in the record here

18 of CAF. Is that one of the sources, or is it -- and who does

19 it apply to?

20     A    CAF is the Civilian Administrative Forum. It

21 applies to all civilians that are there attached to the

22 Government somehow. That process was one of the sources, but

23 that again -- I mean, that -- CAF is initiated through a

24 report from either Security or NCIS or Japanese police, and

25 then we made a conscious decision to send it that route. And

1   then the CAF officer who heard all the facts would make a
2   recommendation, which would also come to my office and then
3   be forwarded to the commander. So it was a source, but it
4   was another fact-finding tool for the commander. But it
5   wasn't a source of information -- of new information.

6       Q       Would CAF apply to all civilians -- all U.S.
7   civilians?

8       A       All U.S. civilians somehow attached or under the
9   jurisdiction of CFAY -- not necessarily all civilians who
10  were there in Japan. We had some TA (ph) personnel that
11  probably wouldn't come under that. But anybody that was
12  basically permanently stationed there, yes.

13      Q       Would it apply to local hires that are resident in
14  Japan but not --

15      A       It would. You know, in that sense, it was people
16  that were local hires that somehow had residency outside of
17  the government-sponsored residency. It was somewhat of a
18  voluntary process. I mean, it was a choice they had to make.
19  They could submit themselves to CAF in exchange for continued
20  access to the base. And if they didn't, probably what would
21  happen, depending on the facts, of course, would be they
22  could end up being debarred. So it was a risk they had to
23  face, so most of them would submit to CAF.

24      Q       In the case of Mr. Edwards, was he given an
25  opportunity, or was it mandatory that he go through CAF?

1    A    No.  CAF is not a mandatory process to me.  It's

2    a tool that the commander uses in cases he feels are

3    appropriate.  Certain cases we didn't send to CAF because we

4    didn't think there was a need for it.  Like I said, it's a

5    fact-finding tool that the commander used in cases where he

6    felt like he needed -- where he felt that the CAF was

7    appropriate.

8        Q    Okay.  So when you say "we," you mean you, the

9    chief staff officer and commander?

10       A    That's basically it.  We -- us three were the ones

11   who generally made the decisions whether to send the case to

12   CAF or not.

13       Q    Okay.  Thank you.

14            Okay.  The records of debarment at CFAY indicate

15   some people were permanently barred, while others were

16   debarred for a period of two years or less.  In what way --

17   what criteria did you have to differentiate between the

18   periods of length of debarment?

19       A    Well, the commander would look at a lot of

20   factors.  The main one, of course, is the seriousness of the

21   offense, danger to the community, rehabilitative potential of

22   the accused.  But let me preface this by saying that when I

23   first arrived in '97 to CFAY, they had a policy where they

24   essentially debarred everybody permanently.  There was a time

25   when, after I got comfortable and I was there in my job, that

1 wards -- after the captain made his decision not to debar

2 Mr. Edwards.

3     Q    What was Master Chief Moore's reaction to that

4 discussion?

5     A    Well, he clearly -- I mean, he disagreed with my

6 recommendation and the captain's decision. But, I mean,

7 there's not much he could do. I mean, it was the captain's

8 decision.

9     Q    Did you indicate to Master Chief Moore that in

10 lieu of debarment some other sort of action would be taken by

11 the command to notify Complainant that his past incidents

12 were considered serious and to warn him of any -- that any

13 future involvement may lead to debarment?

14     A    I can't recall.

15     Q    Okay. Complainant was involved in an off-base

16 incident on January 11th, 1999. How did you happen to find

17 out about that incident?

18     A    Well, I don't specifically remember how I found

19 out about it. But the normal course of action was every

20 morning we had -- every morning meaning every working day

21 morning, Monday through Friday -- me, myself, a Security

22 officer, the command master chief for the command, for CFAY,

23 as well as the duty officer, would have a morning meeting

24 starting around 6:45, seven o'clock in the morning, and we

25 would go over every incident that appeared on the Security

1  blotter that night and that morning.  If he was involved in

2  an incident where Security got involved, I would've found out

3  about it that way.

4      Q      Okay.  After finding out about the incident, what

5  action did you take?

6      A      Well, like I said, I don't remember exactly what

7  I did.  The normal course would be for me to get a report --

8  an incident -- complaint report, which contains some basic

9  facts summarized by the Security officer, witness statements,

10  and, you know, a list of evidence, that sort of thing.  And

11  then once I get that in my office, then I would make a

12  recommendation to the chief staff officer and the captain

13  that somebody be debarred.

14      Q      So --

15      A      If Captain Wylie issued a debarment letter in

16  Mr. Edwards' case, that was the procedure that was in place

17  that would've allowed him to get all the information and make

18  that decision.

19      Q      So you see Mr. Edwards' name on the blotter.

20      A      Yes.

21      Q      Would you then proceed to assemble the documents

22  for debarment?

23      A      Now, I don't know if I recognized Mr. Edwards'

24  name immediately, or if Master Chief Moore called me.  It

25  could've been either way.  Or somebody else could've called

1  weeks.

2      Q      Can you describe the process that was in place for

3  conducting these security background checks?

4      A      When an employer, such as the Moral, Welfare &

5  Recreation Division -- MWR -- Navy Exchange, HRO -- and

6  there's some others -- have an individual who's requesting

7  employment at their agency, they submit for a background

8  investigation.  That investigation request comes through on

9  a single typewritten page, signed by normally their personnel

10 officer, requesting a background check of whoever the

11 employee or the person seeking employment is.  Then we run

12 that through a couple of different offices within the

13 Security Department -- be it Traffic for traffic citations,

14 and be it through the Criminal Investigation Division -- has

15 a computer database of incidents that may have happened here

16 in the Yokosuka area that may have involved us.

17         From there, they submit those documents or that

18 readout back to me, and I either annotate on the request form

19 that information exists that they should consider, or that no

20 information exists, and sign that, and we send it back to the

21 employment agency.

22     Q      Okay.  Were you satisfied that that was -- with

23 that process?

24     A      When I arrived in July of '98 and I took over that

25 process, I think the process had some holes in it at that

*Ad Hoc Reporting*

1 came in to talk to me, their closing comment to me was, is

2 there anything or any way that I would make a different

3 recommendation as to regards to the debarment of Mr. Edwards?

4     Q    And your response?

5     A    It was "no."

6     Q    Now, did she ask you to leave him alone or not

7 harass him anymore?  Is that --

8     A    I don't recall her asking me to do that, because

9 I wasn't making any contact with Mr. Edwards.  I've never

10 telephoned him.  I've only seen him just today.  So I don't

11 know why she would've even made a comment like that.

12     Q    Did any of your superiors, the security officer,

13 the chief staff officer, Captain Wylie, make any request of

14 you relative to Mr. Edwards at this time?

15     A    Not that I recall, no, sir.

16     Q    Okay.  On January 11th, 1999, Mr. Edwards was

17 involved in the off-base incident that eventually led to his

18 debarment.  How did you become aware of that?

19     A    I'd become aware of that probably by the next

20 morning.  I see the desk journal every morning as part of my

21 duties.  I would've gotten a phone call about 6:00 in the

22 morning as part of the normal turnover that all of these

23 incidents had occurred that night, and that's how I would've

24 known that Mr. Edwards was involved again.

25     Q    Now, some of the -- do all of the Security people

1  members, if they were in fact involved with a rape or
2  something of that nature, they're no longer here.
3      Q    But not a single one of those did you recommend --
4  did you write a debarment report.
5      A    I had no reason to believe that any one of those
6  other folks were going to stay in the area and request
7  employment on the base and again represent the United States
8  Government. I had no reason to believe that until they'd
9  submit an employment request. In Mr. Edwards' case, that was
10  different. I knew that he was in the area and he had
11  submitted an employment request.
12      Q    I'm just talking about the reports of civilian
13  employees and dependents.
14      A    And were they in fact CAF'd and removed from
15  Japan? I don't know.
16      Q    Some were CAF'd, some weren't, some were
17  debarred --
18      A    Yes, sir.
19      Q    -- for differing periods of time.
20      A    As I indicated up front, Mr. Eldridge, is I just
21  left a command where I made numerous recommendations for
22  disciplinary action one way or the other for over four years,
23  and had been on board all of less than about a month when
24  this first one came across my desk. I still think that that
25  background was extensive enough to warrant some type of

1  Lieutenant Commander O'Neill, or at this time, Lieutenant

2  Lee.  Those are cases that are currently ongoing.  They're

3  well aware of them.  It's happening right now.

4            MR. MANESE:  No further questions.

5            EXAMINATION BY THE ADMINISTRATIVE JUDGE

6            ADMINISTRATIVE JUDGE:  With respect to this other

7  debarment matter which you aggressively pursued you touched

8  on here, it was another permanent debarment that you were

9  seeking.  You were -- you developed a package to support your

10 recommendation, and you were -- that this procedure was

11 aborted, for whatever reason, because you thought it was a

12 fait accompli.  Do you know the -- do you recall the name of

13 the individual involved in that, the target?

14            THE WITNESS:  Yes, sir, I do, because I previously

15 had business dealings with him.

16            ADMINISTRATIVE JUDGE:  And what was his name?

17            THE WITNESS:  His name is Richard Mason.

18            ADMINISTRATIVE JUDGE:  And do you know his race?

19            THE WITNESS:  He's an African-American.

20            ADMINISTRATIVE JUDGE:  Okay.  I don't have any

21 other questions.

22            Any questions?

23            (No audible responses.)

24            ADMINISTRATIVE JUDGE:  I think that's it.  Thank

25 you very much, Chief.  That concludes your participation.

## Ron Moroni

| | |
|---|---|
| **From:** | "Lynch, Ed" <Ed.Lynch@usdoj.gov> |
| **To:** | <moroni@guam.net> |
| **Sent:** | Friday, October 04, 2002 1:00 PM |
| **Subject:** | Edwards v England D CT. 02-0003 |

Ron Maroni
Tarpley and Maroni LLP
137 Murray Blvd ste 201


Dear Mr. Maroni:
I have forwarded your discovery request to Mr. Mark Nelson, at the EEO office at Yokosuko Naval Base Japan to have him start locating the documents you request. Your letter indicates you plan on being in Japan from 22 to 25 October 2002. If acceptable to you, we can plan on the plaintiff's deposition on Thursday 24 October 2002. I will be arriving in Japan on Sunday 20 October 2002. This will give me time to assure all the documents will be available for your review on 22 October 2002.
It is also my understanding that you intend to interview potential witnesses while you are there. If any of these interviews result in a decision on your part to identify them as witnesses, I would appreciate being informed as soon as possible that week so we can arrange depositions while we are both there. I understand that this may not be possible but it would assist us both if it could be arranged.
I am not aware of any available civilian court reporters located at the military base at Yokosuka. To alleviate the necessity of trying to track down court reporters in Japan through the U.S. embassy, I would suggest we agree to use federally employed court reporters who are on the military bases. The military has both civilian and military court reporters certified under Title 10 United States Code which I can request be made available for these depositions. They generally perform court reporting functions for military trials. Please let me know at your earliest convenience if this alternative would be acceptable so I can arrange one of these military court reporters..
When you arrive I suggest you contact Mr. Mark Nelson EEO manager for Yokosuka Naval Base at 243-7092 or 8179. He will be my primary point of contact to arrange the discovery .

Thank you in advance for your cooperation.


Sincerely,
// s// Edward J. Lynch
Special Assistant U.S. Attorney

----- Original Message -----
From: "Lynch, CDR Edward" <N00J@guam.navy.mil>
To: "'Lynch, Ed'" <Ed.Lynch@usdoj.gov>; "'Ron Moroni'"
<guamlawyers@guam.net>
Cc: "Schwab, Mikel" <Mikel.Schwab@usdoj.gov>; "Lynch, CDR Edward"
<N00J@guam.navy.mil>
Sent: Friday, November 15, 2002 4:32 PM
Subject: RE: Edwards v Sec of Navy


Follow-up

Ron: Just got word this afternoon that Yokosuka has prepared copies of
debarment records, and Commander Fleet Activities Yokosuka security
incident reports. I'm told that they are currently researching all CAF
(Civilian Adjudicative Forum) records from 1995 to the present.  The
staff has also reproduced the other miscellaneous info like CAF
instructions and SOFA document.  I will coordinate their delivery to
you ASAP



.v/r Ed Lynch > > CDR. Edward  J. Lynch,  JAGC, USNR
> Force Judge Advocate
> Commander U.S. Naval Forces Marianas
> PSC 455, BOX 152
> FPO: AP 96540-1000
> 671-339-5291
> Fax: 671-339-6119
>
>
>
> -----Original Message-----
> From: Lynch, Ed [mailto:Ed.Lynch@usdoj.gov]
> Sent: Friday, November 15, 2002 01:43 PM
> To: 'Ron Moroni'
> Cc: Schwab, Mikel; 'n00j@guam.navy.mil'
> Subject: RE: Edwards v Sec of Navy
>
>
> Ron: I apologize for the delay. In sent an e-mail to Yokosuka
yesterday and > an awaiting their response. I understand your position
and will not hold you > to any timelines, but I can not tell you what
the Judge will do. I am  continuing to try and get Navy in Yokosuka to
give me the information  requested.  Did you identify any new witnesses
while you were in Japan? Can  you give me names contact numbers etc.?
Do you feel you are in the position  to discuss settlement now that you
have had a chance to do more  investigation? Please let me know if you
want to meet to discuss any issues  and or settlement. We will need to
meet fairly soon regardless to discuss  any stipulations or other pre-
trial matters if we can not settle. I assume  you will want to meet and
discuss before the holidays at the latest.  Sincerely, Ed Lynch >

Edward J. Lynch
Special Assistant U.S. Attorney
District Of Guam
>
>
 -----Original Message-----
 From: Ron Moroni [mailto:guamlawyers@guam.net]
 Sent: Wednesday, November 13, 2002 12:58 PM
 To: Lynch, Ed
 Cc: n00j@guam.navy.mil
 Subject: Edwards v Sec of Navy
>
>
 Ed.
>
 Please contact me about the discovery in Edwards. As I am sure you
know,
we
 were not able to review any documents when we were in Japan. We were
told
 that the documents were not available. It was not clear whether anyone
was
 working on them.
>
 I notice  the deadline date for filing discovery motions has actually
 passed, so I feel I need to file something soon if we cannot work this
out.
>
 Please contact me at your earliest convenience.
>
 Ron Moroni
>